**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 09-cv-01515-CMA-CBS

JAMES E. PHILLIPS, JR.,

      Plaintiff,

v.

BOARD OF WATER COMMISSIONERS,
DENVER WATER DEPARTMENT,
ROBERT MAHONEY, and
MICHAEL LEISTER,

      Defendants.

---

## ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

---

      This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. # 62). Plaintiff James E. Phillips, Jr. ("Plaintiff") brings suit against his former employer, Denver Water, and two former supervisors, Robert Mahoney and Michael Leister, in their individual and official capacities (collectively "Defendants"). Plaintiff alleges violations of his First Amendment rights pursuant to 42 U.S.C. § 1983, as well as violations of federal employment discrimination statutes, 42 U.S.C. §§ 1981 and 2000e, *et seq.* ("Title VII").

## I.  BACKGROUND

### A.  FACTS

      The following facts are undisputed, unless otherwise noted. The Court will elaborate, as needed, in its analysis section.

Plaintiff James E. Phillips, Jr., an African-American male, began working at Denver Water on or about March 7, 1988.  Denver Water is a municipal water utility, governed by The Board of Water Commissioners ("Board").  At all relevant times, Plaintiff was a Construction Project Inspector II.  From May 2006 to May 2007, Plaintiff worked on the Montclair Recycled Water Pump Station ("Montclair Project").  The Montclair Project was built using a delivery method known as Construction Manager/ General Contractor ("CM/GC"), an alternative to the low-bid design/bid/build model most often used by public entities.  Lillard & Clark Construction Company ("Lillard & Clark") was the contractor on the Montclair Project.  Plaintiff's immediate supervisor was Bruce Field.  Next in the chain of command was Defendant Michael Leister, the Chief of Construction Management.  One level above Mr. Leister was Defendant Robert Mahoney, Director of the Engineering Division.

### Problems at the Montclair Project

As a Construction Project Inspector II, Plaintiff was responsible for ensuring that the work performed by Lillard & Clark on the Montclair Project complied with the terms of the contract.  (Doc. # 62-3, Ex. C; Doc. # 62-4, Ex. D at 47: 8-15.)  Plaintiff, thus, was responsible for reporting any non-compliance with the contract to his supervisors.  (Doc. # 62-4, Ex. D at 55: 14-24.)  As required, Plaintiff soon began reporting problems with Lillard & Clark's compliance to his supervisors, including Defendants Mahoney and Leister.  For example, on January 30, 2007, Plaintiff sent an email message to Defendant Leister, reporting that Lillard & Clark had "taken advantage of the CM/GC

2

format to unscrupulously and methodically overcharge for the work." (Doc. # 62-7,

Ex. G.)  On May 7, 2007, Plaintiff sent an email message to Defendant Mahoney,

reporting that  the CM/GC format "has failed in all applications to work for Denver Water"

and recommended "administrative adjustments" to correct perceived problems. (Doc.

# 62-8, Ex. H.)

In addition to his criticisms of Lillard & Clark's performance and the CM/GC method

in general, Plaintiff had "numerous disputes" with Mr. Harry Brust, the Project Manager for

Lillard & Clark.[1]  (Doc. # 78, Plaintiff's Corrected Response to Motion for Summary

Judgment ("Response") at 4.)  By late April, tension between Plaintiff and Mr. Brust had

escalated to a point where they could no longer work together.  (Doc. # 62, Defendants'

Combined Motions for Summary Judgment ("Motion for Summary Judgement") at 6.)

Consequently, both Mr. Brust and Plaintiff were removed from the physical site.  Plaintiff

requested documentation from Defendant Mahoney regarding his reassignment.  On

June 21, 2007, Defendant Mahoney responded that staffing changes were made "without

assignment of blame to any individual(s), but made in an effort to best move the project

forward." (Doc. # 62-11, Ex. K.)

Plaintiff was reassigned to inspect the River Point Project.  One year later, he

received a performance evaluation from his immediate supervisor on the Montclair

Project.  He was given a score of 385/400, earning a "Frequently Exceeds Expectations"

---

[1]  Plaintiff was not the only employee that had difficulty getting along with Mr. Brust.
(Doc. # 71, Leister Depo Ex. C, 65:28 to 66:8.)

rating.  Defendant Leister downgraded the score to 361.25/400,[2] setting in motion the

chain of events that would lead to Plaintiff's eventual termination.

   *Post-Downgraded Evaluation Events*

   After receiving notice that his evaluative score had been downgraded by Defendant

Leister, Plaintiff "refuse[d] to sign or accept" the new evaluation.  He charged Denver

Water Senior Managers with "acquiesc[ing]" to Lillard & Clark's demands, resulting in

a project "rife with sub-standard, non-compliant, defective work."  He further contended

that Defendant Leister had "the audacity to down grade my performance evaluation based

on his inability to handle a dishonest, deceitful contractor."  Plaintiff also requested an

independent audit of the Montclair Project as well as all other CM/GC projects.  (Doc.

# 62-13, Ex. M.)

   On July 30, 2008, Plaintiff sent an email message to Carla Elam-Floyd, Manager

of Human Resources, with a copy to Defendant Leister, asserting that the "real issue"

underlying the lowered report was the "unethical, illicit compliance of Senior DWD

Engineering Managers in allowing Contractors to fraudulently charge millions of dollars for

sub-standard, non-compliant, defective construction."  (Doc. # 69-13.)  Ms. Elam-Floyd

responded to Plaintiff's email message on August 4, 2008, informing him that such serious

---

   [2]   Defendant Leister commented in the score report that "while [Plaintiff] was not the
sole cause [of interpersonal conflicts on the Montclair Project], I feel that [Plaintiff] could have
made the situation better for [Denver Water], and the project, by taking a more professional
and positive role on behalf of the project."   (Doc. # 62-12, Ex. L.)

accusations should be handled outside of the employee evaluation process.[3]  She referred

his email message to an internal auditor and told Plaintiff that he would be asked to

provide specific information to support his charges. She also cautioned that Plaintiff should

"reconsider the tone of [his] response."  (Doc. # 62-15, Ex. O.)

During this same time-frame, apparently, Plaintiff also contacted the Attorney

General of the State of Colorado ("Attorney General's Office") to report his suspicion of

waste, fraud, and abuse at the Montclair Project.[4]

On August 13, 2008, Defendant Leister reiterated the request that Plaintiff provide

specific information to support his charges.  (Doc. # 62-16, Ex. P.)  Plaintiff responded that

he had already done so in previous communications, referring to his daily reports from his

time on the Montclair Project and his various email messages criticizing Lillard & Clark.

Eight days later, Defendant Leister issued an official written warning to Plaintiff, stating

that Plaintiff was entitled to his opinions, but could not express them "in a disrespectful or

demeaning manner."  (Doc. # 62-18, Ex. R.)

---

[3]   Ms.  Elam-Floyd also noted that, "Mr. Leister's review of the evaluation and his modi-fications were appropriate and in keeping with the Engineering Division's practice of having Section Heads review and approve evaluations . . . ."  (Doc. #62-15, Ex. O.)

[4]   Neither party provided a citation to the place in the record where this communication could be found and the Court was not able to locate it in the record.  However, both parties acknowledge its existence.  Defendants have submitted sworn affidavits stating that they had no knowledge of this communication until well after Plaintiff's termination.  (Doc. # 62-1, Affidavit of Robert Mahoney, ¶ 23; Doc. # 62-2, Affidavit of Michael Leister,  ¶ 23.)  Plaintiff provides no evidence to support his speculation that Defendants were aware of this communi-cation.  In addition, he admits that he did not know whether Denver Water ever received a copy of the letter prior to discovery in this case.  (*See* Doc. # 62-4, Ex. D at 304:13 to 305:21.)

Several days later, Plaintiff received an evaluation for his work at the River Point Project. His direct supervisor, Tony Cocozzella, gave Plaintiff a score of 195/400 (Fails to Achieve What is Expected). (Doc. # 62-21, Ex. U.) This score was significantly lower than previous evaluations.[5] The low marks were "based on [Plaintiff's] final submited [sic] plans which were blank." (Doc. # 69-14, Ex. J.) Defendant Mahoney then consolidated and pro-rated Plaintiff's River Point Project score with the Montclair Project score to create a hybrid number. (Doc. # 62-22, Ex. V.)

Plaintiff refused to meet with Defendant Mahoney to discuss the score unless Mr. Field, Mr. Cocozzella, and a member of Human Resources were also present. Defendant Mahoney stated that he would determine who attended the meeting. (Doc. # 62-23, Ex. W.) On September 11, 2008, Plaintiff sent the following email message to Ms. Elam-Floyd, with copies to several other people, including Defendants Mahoney and Leister:[6]

---

[5] From 2001 through 2005, Plaintiff's performance rating did not fall below the second highest score range, Frequently Exceeds Expectations (Doc. ## 69-2 - 69-5, Ex. L; Ex. M; Ex. N; Ex. P.) From 2005 through 2007, Plaintiff received ratings which placed him in the highest range, Consistently Exceeds Expectations (Doc. ## 69-6 and 69-7, Ex. P; Ex. Q.)

[6] Based on the arguments made by the parties, it appears that Plaintiff also sent this email message to three individual Board members, but the Court was not able to confirm this fact from the information provided by the parties. However, the undisputed evidence in the record with respect to this communication indicates that none of the Defendants knew that the email message was sent to the Board members until well after Plaintiff's termination. (Doc. # 62-6, Affidavit of Michael Leister, ¶ 24; Doc. # 62-2, Affidavit of Robert Mahoney, ¶ 26.)

> Subject: Personnel Policies: 2-10-(1), 2-12- (2) - Whistleblower Protection, Conflict of Interest
>
> I, James E. Phillips Jr., am formally requesting that Senior Engineering Managers: Robert Mahoney, John Bambi, Mike Leister, be relieved of all administrative authority over me. I am formally accusing them of Professional Malfeasance in the administration of the CM/GC GMP contracts that has allowed select Contractors to fraudulently overcharge Denver Water millions of dollars in excess of their actual cost and allowed profit.
>
> It is therefore inappropriate, unethical and unprofessional for them to continue to retaliate/harass me with their contrived evaluation and written warning procedures. Therefore to protect myself, I will evoke the aforementioned Personnel Policies.

(Doc. # 62-24, Ex. X.)

On September 18, 2008, Defendant Mahoney held a Division Conference attended by Plaintiff, Defendant Leister, and Georganne Chapman, Human Resource Specialist. The participants at the meeting discussed Plaintiff's alleged violations of Denver Water Personnel Policies.  The next day, Defendant Mahoney gave Plaintiff a list of "assignments" that Plaintiff needed to complete to avoid immediate termination. Assignment 1 required Plaintiff to write a formal, unqualified apology to Defendant Leister and John Bambei.  (*See* Doc. # 62-26, Ex. Z.)  Plaintiff agreed to the other assignments, but refused to write a "formal unqualified letter of apology."  (Doc. # 62-27, Ex. AA.) Plaintiff was terminated on September 23, 2008, for failing to write the letter of apology. (Doc. # 62-28, Ex. BB.)

**B.     PROCEDURAL HISTORY**

On June 29, 2009, Plaintiff filed a complaint against the following defendants: Board of Water Commissioners, Denver Water Department, Hamlet "Chips" Barry, Robert

Mahoney, and Michael Leister.  Mr. Barry was terminated as a defendant pursuant to a

Minute Order granted on October 9, 2009.  (Doc. #27.)  On September 24, 2010, the

remaining defendants filed a Motion for Summary Judgment, arguing that Plaintiff's

speech was not protected by the First Amendment and that they did not engage in

violations of federal employment discrimination statutes.  (Doc. # 62.)  Plaintiff responded

on October 21, 2010 (Doc. # 78), and Defendants filed a reply on November 15, 2010.

(Doc. # 86.)

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if the moving party demonstrates that there is "no

genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all

reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler*

*v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A fact is "material" if, under the

applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of fact is "genuine" if

"there is sufficient evidence on each side so that a rational trier of fact could resolve the

issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine

issue of material fact and entitlement to judgment as a matter of law.  *Id.* at 670-71.  In

attempting to meet that standard, a movant that does not bear the ultimate burden of

persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III. ANALYSIS

## A. FREEDOM OF SPEECH RETALIATION CLAIM

Plaintiff alleges that Defendants unlawfully terminated him in violation of 42 U.S.C. § 1983 in retaliation for exercising his First Amendment right to free speech. To prevail on

this claim, Plaintiff must demonstrate that the Defendants' termination of his employment was in fact a deprivation of his First Amendment rights.  *See* 42 U.S.C. § 1983; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001).

By entering government service, public employees "accept certain limitations on [their] freedom."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  When the government functions as an employer rather than as a sovereign entity, it is granted "a significant degree of control over [its] employees' words and actions."  *Id.*  At the same time, "the First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens."  *Id.* at 419.  Consequently, courts must balance the individual and societal interests promoted by free speech with the needs of government to provide effective services.  *See id.* at 420.

In order to achieve this delicate balancing, the Tenth Circuit uses the five step test set out in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), and modified by *Garcetti* ("*Garcetti/Pickering*"); each step must be satisfied by Plaintiff:

> (1)  whether the speech was made as a private citizen, as opposed to pursuant to an employee's official duties;
>
> (2)  whether the speech was on a matter of public concern;
>
> (3)  whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;
>
> (4)  whether the protected speech was a motivating factor in the adverse employment action; and
>
> (5)  whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010) (citing *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007).

The first three prongs of the *Garcetti/Pickering* test are questions of law to be determined by the court, while the last two are normally reserved for the trier of fact. *See Brammer-Hoelter*, 492 F.3d at 1203.

      1.     <u>Speech Pursuant to Official Duties</u>

The first *Garcetti* prong looks at whether Plaintiff spoke as a private citizen or as a government employee acting in a professional capacity. *See Garcetti*, 547 U.S. at 413; *Rohrbough*, 596 F.3d at 745; *Brammer-Hoelter*, 492 F.3d at 1203. If the employee did not speak as a private citizen, but rather, spoke pursuant to his official duties as a governmental employee, the employee has no First Amendment cause of action based on his employer's reaction to the speech. *See Garcetti,* 547 U.S. at 418; *Connick v. Myers*, 461 U.S. 138, 147 (1983). In *Garcetti*, the court declined "to articulate a comprehensive framework for defining the scope of an employee's duties where there is room for serious debate." 547 U.S. at 424. Accordingly, there is no bright-line test to determine whether speech is made pursuant to official duty. The proper inquiry is instead a practical one, taking into consideration "all the facts and circumstances surrounding the speech and employment relationship." *Brammer-Hoelter*, 492 F.3d at 1204.

Tenth Circuit decisions have taken a "broad view" of an employee's official duties with regards to this prong. *Rohrbough*, 596 F.3d at 746 (quoting *Thomas v. City of*

*Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008)).  The duty does not need to be "explicitly

required," *Green v. Board of Cnty. Comm'rs*, 472 F.3d 794, 800 (10th Cir. 2007), nor does

it need  to pertain to a normal aspect of an employee's job.  *See Brammer Hoelter*, 492

F.3d at 1203.  Rather, the focus should be on whether the speech "contributes to or

facilitates the employee's performance . . . ." *Id.* at 1203.

At the outset, it is necessary to pinpoint the speech cited as the basis for the

retaliation claim. This task requires some degree of conjecture by this Court for the speech

at issue is not clearly articulated by Plaintiff.[7]  The most straightforward approach is to

separate Plaintiff's speech into two temporal categories: communications made prior to his

downgraded review, and communications made thereafter.

a.    *Pre-Downgraded Review Communications*

The pre-downgraded review communications are primarily email messages Plaintiff

sent to Defendant Mahoney, in which Plaintiff criticized Lillard & Clark's compliance with

---

[7]  Plaintiff states that his "2007 speech" was at issue.  (*See* Doc. #78, Response at 16.)
Throughout the Response, Plaintiff refers to "the speech" but never explains which speech led
to the allegedly unlawful retaliation.  Further complicating matters, much of the speech at issue
in this case occurred during 2008, including the speech that directly preceded his termination.
Equally vague, Plaintiff's Complaint mentions "statements regarding waste, fraud and abuse"
but does not direct the Court to where those statements are found.  (Doc. #1 at 25.)  At the
summary judgment stage, the nonmoving party must "set forth specific facts that would be
admissible in evidence in the event of trial from which a rational trier of fact could find for the
nonmovant."  *Adler*, 144 F.3d at 671.  It is highly questionable whether this burden of specific
facts has been met given that Plaintiff has failed to clearly identify what speech is at issue.
However, in the interest of thoroughness, the Court will assume that the speech at issue
consists of the various communications in the record in which Plaintiff complains about Lillian &
Clark, the CM/GC method, his downgraded evaluation, and the Defendants' alleged "unethical,
illicit" activity.

the contract and recommended that Denver Water avoid using the CM/GC format again. (*See* Doc. # 62-7, Ex. G.; Doc. # 62-8, Ex. H.)

The parties disagree over the exact scope of Plaintiff's duties.  However, Plaintiff admits that his "2007 speech" concerned his work and it is undisputed that Plaintiff was required to inspect whether the work done by the contractor complied with the contract and to report his findings to his supervisors.  (*See* Doc. # 78, Response at 16 and 3-4.) Thus, Plaintiff's communications relating to Lillard & Clark's compliance with the terms of the contract were made in the course of Plaintiff's official duties.  As such, this speech is not protected by the First Amendment.

Plaintiff cites *Brammer-Hoelter* for his argument that his speech criticizing the CM/GC method was outside the scope of his official duties.[8]  *See* 492 F.3d at 1204-05. In *Brammer-Hoelter*, a group of teachers met to discuss issues relating to their school. Although most of the issues pertained to their official duties, the Tenth Circuit held that criticisms of supervisors and academic policy were not pursuant to the teachers' official duties.  Plaintiff's citation to *Brammer-Hoelter* is to no avail.  There are numerous distinctions between *Brammer-Hoelter* and the case at bar.  Unlike the group of teachers, Plaintiff's speech occurred at work, during working hours, and was directed to his supervisors rather than to any outside audience.  *Cf. Brammer-Hoelter*, 492 F.3d at 1205 (noting that discussions took place after hours, outside of the school, and included

---

[8]   Once again, this involves some conjecture on the part of the Court because of the lack of precision in Plaintiff's Response.

ordinary citizens and parents who were not employed by the school).  More importantly,

Plaintiff's observation that Lillard & Clark was taking advantage of the CM/GC format

informed his opinion that Denver Water should not use CM/GC contracts in the future.

In other words, his speech concerning the advisability of CM/GC contracts "owe[d] its

existence" to his role as a Construction Project Inspector.  *See Gelfand v. Cherry Creek*

*Sch. Dist.*, No. 07-cv-01923, 2009 U.S. Dist. LEXIS 48931, at *23 (D. Colo. June 10,

2009) (unpublished) (noting that but for the plaintiff's position, he would not have been

privy to the information shared).

   As such, Plaintiff's speech was made in his capacity as a Project Inspector and

not as a private citizen.  The entirety of Plaintiff's pre-downgraded evaluation speech

was therefore pursuant to Plaintiff's official duties and is not protected speech under

*Garcetti*.

### b.    Post-Downgraded Review Communications

   Plaintiff's post-downgraded evaluation speech consisted of accusations that

Senior DWD Engineering Managers allowed Contractors to fraudulently charge millions

of dollars for sub-par work.  The Court finds that this speech was also pursuant to

Plaintiff's official duties.

   Although Plaintiff clearly had a duty to monitor the work of Lillard & Clark, it

is arguable that he did not have the same duty to monitor the performance of his

supervisors.  Plaintiff's speech alleges not only that Lillard & Clark committed fraud

against the public, but also, that his supervisors were complicit in the fraud.  At first

14

blush, this speech may seem outside of Plaintiff's official duties.  The speech raised concerns about "unethical or corrupt behavior" on the part of Denver Water Senior Managers.  *See Montgomery v. Bd of Cnty. Comm'rs of Douglas Cnty., Colorado*, 637 F. Supp.2d 934, 941 (D. Colo. 2009) (holding that plaintiff's statements were not made pursuant to official duties because they "were likely made in order to raise concerns about unethical or corrupt behavior by the Coroner's office.").

The Tenth Circuit has repeatedly emphasized two factors that guide the practical inquiry into whether the speech was made as a private citizen or pursuant to official duties: (1) whether the employee's job responsibilities related to reporting wrongdoing, and (2) whether the employee went outside the chain of command when reporting the wrongdoing.  *See Reinhardt v. Albuquerque Public Schs. Bd. Of Educ.*, 595 F.3d 1126, 1135-36 (10th Cir. 2010); *Brammer Hoelter*, 492 F.3d at 1205 (finding that teachers had no duty to report some of problems discussed and their speech relating to those problems was therefore that of private citizens); *Casey v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1332 (10th Cir. 2007) (finding that it was "significant that [her speech was] made solely to her superiors" in rejecting the plaintiff's retaliation claim); *Thomas*, 548 F.3d at 1324 (noting that plaintiff "threatened to go outside his usual chain of command . . . leads us to believe that he was not acting pursuant to his official duties."); *Rohrbough*, 596 F.3d at 747 ("speech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties.").

15

Unlike the plaintiff in *Montgomery*, Plaintiff acknowledges that his job entailed "an ethical and professional obligation to correct and/or report [any] wrongdoings," *i.e.*, Plaintiff had a duty to report wrongdoing.  This "obligation" was not limited to exposing wrongdoing by contractors, rather it concerned any wrongdoing on one of Plaintiff's projects.  (Doc. # 62-20, Ex. T.)  In addition, with the exception of Plaintiff's communication to the Attorney General's Office, Plaintiff's speech occurred entirely within his chain of command.[9]  *See Thomas*, 548 F.3d at 1324-25 (noting that had plaintiff simply reported the suspected activity to his boss instead of to the Oklahoma State Bureau of Investigation, his speech likely would have been pursuant to his official duties); *Reinhardt*, 595 F.3d at 1137 ( plaintiff's speech did not become that of a private citizen until she went "beyond complaining to administrators" by consulting a lawyer and filing an Individuals with Disabilities Education Act Complaint).

In marked contrast, in the instant case, Plaintiff's communications were to his supervisors and representatives of Human Resources, *i.e.*, they were internal in nature and within his chain of command.

2.     <u>Causal Connection Between Speech and Adverse Employment Action</u>

Although most of Plaintiff's speech was made pursuant to his official duties and, thus, is not protected by the First Amendment, the letter Plaintiff apparently sent to the Attorney General's Office alleging waste, fraud, and abuse by Denver Water

---

[9]   The communication with the Attorney General's Office is considered in the next section of analysis.

Management on the Montclair Project might survive the first *Garcetti* prong.  *See Casey*, 473 F.3d at 1332-33 (holding that statements made to the New Mexico Attorney General's Office were protected speech).  However, the Court need not determine whether the speech was made as a private citizen or pursuant to the Plaintiff's official duties because such speech cannot survive the fourth prong of the *Garcetti/Pickering* test – "whether the protected speech was a motivating factor in the adverse employment action."  *Dixon*, 553 F.3d at 1302.  Although this is a question normally reserved for the trier of fact, there is absolutely no evidence in the record from which a trier of fact could find that Plaintiff's speech to the Attorney General's Office was a motivating factor in his termination.  *See Rohrbough*, 596 F.3d at 750 (holding that there was insufficient evidence to find communications were a motivating factor in plaintiff's termination where plaintiff did not tell her supervisor or any other superiors of her decision to report an incident).  Defendants have submitted sworn affidavits stating that they had no knowledge of the communication to the Attorney General's Office until well after Plaintiff's termination.  (Doc. # 62-1, Affidavit of Robert Mahoney, ¶ 24; Doc. # 62-2, Affidavit of Michael Leister, ¶ 23.)  There is no evidence that the Attorney General's Office ever contacted the Defendants, nor does Plaintiff allege that he informed the Defendants of his communication with the Attorney General's Office.  In short, Plaintiff provides no evidence to support his speculation that Defendants were aware of this communication and terminated him in retaliation therefor.  (Doc. # 62-4, Ex. D at 304:13 to 305:21.)  It is true that Plaintiff's termination followed soon after he communicated

17

with the Attorney General's Office; however, mere temporal proximity does not, by itself, establish causation. *See Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1239 (10th Cir. 2009). Considering that there is no evidence that Defendants knew of these communications and knowledge cannot be reasonably inferred given the facts of this case, a rational trier of fact could not reasonably conclude that the communication to the Attorney General motivated the adverse employment action.

In summary, all but one of Plaintiff's communications related to the Montclair Project and were made pursuant to Plaintiff's official duties. With respect to the one communication that is arguably outside Plaintiff's official duties, there is no evidence that Defendants knew about that communication, thus rendering it impossible for the speech to have motivated Plaintiff's termination. Defendants are, therefore, entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

## B. EMPLOYMENT DISCRIMINATION CLAIM

In addition to his First Amendment retaliation claim, Plaintiff also alleges that he was terminated on account of his race, in violation of 42 U.S.C. §§ 1981 and Title VII of the Civil Rights Act of 1964. The elements of these two claims are identical. *See Carney v. City and Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008). In evaluating Plaintiff's claims, the Court applies the *McDonnell Douglas* burden shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, plaintiffs must first establish a *prima facie* case of discrimination. If that burden is met, "the employer [must] articulate some legitimate, nondiscriminatory

18

reason" for its action.  *Id.* at 802.  If the employer is able to do so, Plaintiff must then show the employer's reason is pretextual.  *Id.* at 804; *see also Martinez v. Target Corp.*, 384 Fed. Appx. 840 (10th Cir. 2010).

In order to establish a *prima facie* case of discrimination, Plaintiff must demonstrate that (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination.  *Smith v. Oklahoma ex rel. Tulsa Cnty. Dist. Attorney*, 245 Fed. Appx. 807, 811 (10th Cir. 2007); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004) (same).

Plaintiff has not establish a *prima facie* case of discrimination because his claim does not satisfy the second or third element.  The factual basis for his claim is that Mr. Neil Lillard, a principal in Lillard & Clark, allegedly made derogatory comments about him to Mr. Field, calling Plaintiff a "spook" and requesting "a white inspector that we can work with." (Doc. # 73-8, Ex. E at 358:17-22.)  These remarks do not establish a *prima facie* case of discrimination.  Although Plaintiff is a member of a protected class, he was not terminated under circumstances giving rise to an inference of discrimination. Nor has he established that he was satisfactorily performing his job.

It is true, as Plaintiff points out, that he received excellent evaluations at times during his career at Denver Water.  However, the existence of some positive evaluations does not lead to the conclusion that he was satisfactorily performing his job at the time prior to his termination.  In fact, the evidence suggests the opposite.

In the two months before his termination, Plaintiff received a formal written warning for insubordination by Defendant Leister, was warned by Ms. Elam-Floyd for using an inappropriate tone, and received a poor evaluation from Mr. Cocozzella.  Thus, Plaintiff has not established that he was satisfactorily performing his job at the time he was terminated.

The circumstances surrounding Plaintiff's termination do not give rise to an inference of racial discrimination.  Although a plaintiff may raise an inference of discrimination by establishing that the person who made an adverse decision made discriminatory remarks, *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005), a statement not directed to Plaintiff made by a contractor with no decision making authority does not give rise to such an inference.  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531-32 (10th Cir. 1994) (to demonstrate nexus, inappropriate comment must be directed at plaintiff and be made by a decision maker in the context of the decision at issue).

There is no evidence that any racially discriminatory comments were made by employees of Denver Water, nor is there any reason to attribute Mr. Lillard's comments to Denver Water.  *See Steele v. Kroenke Sports Enterprises, L.L.C.*, 264 Fed. Appx. 735, 745 (10th Cir. 2008).  Furthermore, these comments were made more than one year before Plaintiff's termination.  *See Bittel v. Pfizer, Inc.*, 307 Fed. Appx. 132, 140-41 (10th Cir. 2009) (holding that a comment directed to plaintiff by an individual involved in determining plaintiff's employment status was "simply too far attenuated . . .  to be

probative of [defendant's] motivation" when it was made one year before plaintiff's termination). The most significant evidence that Plaintiff was not terminated due to his race, however, is Plaintiff's own statements. In his email of September 11, 2008 email to Ms. Elam-Floyd, Plaintiff requested that his supervisors be relieved of administrative authority over him because they "continue[d] to retaliate/harass" him because of his accusations that they were guilty of "Professional malfeasance" in allowing "select Contractors to fraudulently overcharge Denver Water millions of dollars in excess of their actual cost and allowed profit." (Doc. # 62-24, Ex. X.)

The entirety of Plaintiff's racial discrimination claim rests on a couple of remarks made more than one year before Plaintiff's termination by a person lacking decision-making authority. In the interim, Plaintiff accused his supervisors of "unethical, illicit" behavior and "Professional Malfeasance." In short, there is no evidence from which a trier of fact could rationally find any connection between the comments and Plaintiff's termination. Defendants are thus entitled to summary judgment on Plaintiff's § 1983 and Title VII claims.

## IV. CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment on all of Plaintiff's claims. Plaintiff's critiques of Lillard & Clark's compliance with the contract, his general criticisms of the CM/GC method, his response to his downgraded evaluation, and his allegations of unethical and illicit behavior on the part of his supervisors are not protected by the First Amendment because they were made

pursuant to his official duties.  In addition, his communication to the Attorney General's

Office cannot support his claim for relief, given that there is no evidence that the

Defendants were even aware of this communication.  Plaintiff has also failed to

establish a *prima facie* case of discrimination necessary for his § 1983 and Title VII

claims.

Accordingly, IT IS ORDERED THAT:

(1)     Defendant's Motion for Summary Judgment (Doc. # 62) is GRANTED;

(2)     This case is DISMISSED WITH PREJUDICE.

DATED:  February __08__, 2011

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge